NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA, | )<br>)<br>) |
| Plaintiff, | )<br>) Civil Action No. 03-3899 (GEB) |
| v. | )<br>) **FINDINGS OF FACT AND** |
| PADRAIG TARRANT, *et al.*, | ) **CONCLUSIONS OF LAW**<br>) |
| Defendants. | ) |

**<u>BROWN, Chief Judge</u>**

This matter came before the Court upon the United States' ("Plaintiff" or "the Government") Complaint alleging that Kathy Chatterton ("Defendant" or "Chatterton") is liable as an "operator" under Section 107(a)(2) of CERCLA for the cost of removal of hazardous waste product from the site of operation of her former employer, MPF Plating and Finishing ("MPF"). The Court conducted a non-jury trial from April 3, 2007 to April 5, 2007, and had the opportunity to observe the manner and demeanor of the witnesses and to assess their credibility. *See United States v. $33,500 in U.S. Currency*, No. 86-3348, 1998 U.S. Dist. LEXIS 19475, at *2 (D.N.J. Aug. 17, 1988). This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

**BACKGROUND**

This case arises out of the generation of hazardous waste product at the Meadowlands Plating and Finishing Site at 890 Paterson Blank Road, in East Rutherford, New Jersey (the

"Site"). (Def. Br. at 4; Pl. Br. at 1.) The Scaglione family – the owners of the Site – formed Top Notch Realty Co. ("Top Notch") as a vehicle for leasing the Site. (Def. Br. at 4; Pl. Br. at 2, 12.) Virginia Scaglione managed the Site lease on behalf of Top Notch. (Def. Br. at 4; Pl. Br. at 12.)

MPF was founded by Padraig Tarrant ("Tarrant") in 1996. (Def. Br. at 5; Pl. Br. at 2.) Mr. Tarrant was the sole shareholder and President of MPF. (Def. Br. at 5; Pl. Br. at 2.) MPF leased the Site in 1996 and maintained its electroplating and metal finishing business there until it was evicted in December 1997. (Def. Br. at 5; Pl. Br. at 2.)

MPF's activities led to the production of hazardous waste, some of which remained on the Site after MPF's eviction. (Pl. Br. at 3.) Between November 1998 and June 1999, the United States Environmental Protection Agency ("EPA") conducted a removal action under Section 104 of CERCLA to ship the hazardous waste off the Site. (Pl. Br. at 3-4.)

The United States and Ms. Chatterton have stipulated that the Site constituted a "facility" for purposes of Section 107 of CERCLA, that hazardous substances had been released at the facility, and that the United States had incurred damages in removing the hazardous waste from the Site. (4/3/07 A.M. Tr. 11:2-21.) In addition, Mr. Tarrant entered into an agreement with the Government at the start of trial pursuant to which Mr. Tarrant "consent[ed] to a judgment against him, and for the United States, in the amount of $1,823,999.86" – that amount representing the total cost of the removal operation. (4/3/07 Consent Judgment.) The United States maintained its claim that "the liability of Defendant Chatterton is joint and several with the liability of Defendant Tarrant." (*Id.*)

Consequently, there remains for this Court only to consider whether Ms. Chatterton can be deemed liable for the costs incurred by the Government during the removal action. (4/3/07

A.M. Tr. 11:25-12:9.)

**DISCUSSION**

**1.    "Operator" Under CERCLA**

The Government contends that Ms. Chatterton is liable for the clean-up costs as she was an "operator" of the Site under Section 107(a)(2) of CERCLA.  That Section provides, in relevant part, that persons liable under CERCLA include: "any person who at the time of disposal of any hazardous substance owned *or operated* any facility at which such hazardous substances were disposed of . . . ." 42 U.S.C. § 9607(a) (emphasis added).  "Under the plain language of the statute, any person who operates a polluting facility is [thus] directly liable for the costs of cleaning up the pollution." *United States v. Best Foods*, 524 U.S. 51, 65 (1998).  As the Supreme Court explained in *Best Foods*:

> an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Best Foods,* at 66-67; *see also BP Amoco Chem. Co. v. Sun Oil Co.*, 316 F. Supp. 2d 166, 170 (D. Del. 2004).

Consistent with *Best Foods*, this Court has held that "an individual will be considered an operator under the 'usual meanings' of the term such that individual liability may be imposed where that individual shows *a high degree of personal involvement in the operation and decision-making process of the business*."  *New Jersey Dep't of Envtl. Protection v. Gloucester*

*Envtl. Mgmnt. Servs.*, 800 F. Supp. 1210, 1215 (D.N.J. 1992) (emphasis added).[1]  The Court's inquiry should not focus on whether the alleged operator "had sufficient control to direct the hazardous substance disposal activities or prevent the damage caused," but should instead seek to determine  whether that individual "participated in the hazardous substance disposal activities." *Analytical Measurements v. Keuffel & Esser Co.*, 816 F. Supp. 291, 298 (D.N.J. 1993). It should be noted, however, that CERCLA "does not draw in persons or entities who have no connection to hazardous waste disposal, other than the knowledge that it is going on."  *Lentz v. Mason*, 961 F. Supp. 709, 716 (D.N.J. 1997).

      **2.**      **Witness Testimony**

The parties do not contest that the Site constitutes a "facility" on which hazardous substances were "disposed of" under CERCLA.  The only question remaining for this Court to consider is whether Ms. Chatterton can be considered an "operator" of the facility under Section

---

[1] The *Gloucester* Court in fact noted with approval the rationale of the district court in *United States v. Conservation Chem. Co.*, 628 F. Supp. 391 (W.D. Mo. 1985):

> The *Conservation Chem.* court interpreted the term 'owner or operator' under § 107 of CERCLA to impose liability on an individual who was the founder, chief executive officer and majority shareholder of the company, *but who also controlled the company's financial matters, administered the affairs of the corporation, executed contracts on its behalf, was the person who gave instructions on equipment, modifications, and customers to be served, and was the person to whom plant managers reported.* Based on these facts and the 'high degree of personal involvement in the operation and decision-making process' the Conservation Chem. court concluded that the imposition of personal liability was appropriate.

*Gloucester*, at 1215-16 (citations omitted), *citing Conservation Chem.*, at 420.

107 of CERCLA.  The Court was presented with the testimony of Mr. Kahn, Ms. Scaglione, Ms. Chatterton, Mr. Tarrant and Mr. Puff on the issue.

     a.  Trial Testimony of Mr. Kahn

Mr. Kahn, the EPA on-scene coordinator, visited the Site in 1998.  4/3/07 A.M. Tr. 13:10-12, 14:17-18.  Mr. Kahn was charged with initiating a removal action at the Site.  *Id*. at 16:14-17:19.  That action involved securing the facility and removing all contaminants from the Site.  *Id.* at 17:17-19.  Mr. Kahn testified that he met Ms. Chatterton – but not Mr. Tarrant – during the removal action, and that drums of hazardous waste had been shipped off the Site "based on Ms. Chatterton's involvement." *Id.* at 20:5-19.

     b.  Deposition Testimony of Ms. Scaglione

Ms. Scaglione helped run Top Notch, and was the primary point of contact between the owners of the Site and MPF.  Scaglione Dep. Tr. 14:17-15:18.[2]  Ms. Scaglione testified that when she first met Mr. Tarrant and Ms. Chatterton,  Ms. Chatterton indicated that she would be "in charge" and was going to "make a lot of changes" around the facility.  *Id*. at 50:2-14, 51:22-25.[3]  Ms. Scaglione noted that Ms. Chatterton expressly stated that she was going to be "hiring,

---

  [2]  While her husband and his two brothers were the owners of Top Notch, they were unable to take care of the business themselves at the time.  Scaglione Dep. Tr. 14:25-15-18.

  [3]  Ms. Scaglione testified as follows:

> Q. And how is it that Mr. Tarrant introduced Ms. Chatterton to you?
> A. I saw Mrs. Chatterton standing in the office, and I walked up to her and I said – I introduced myself, and she said "Hi. I'm Kathy Chatterton, and I'm going to be in charge."
> Q. She said that to you?
> A. Yes, she did.
> Q. And you distinctly recall that?

firing, and taking care of the generalities." *Id*. at 52:24-53:18.[4]  This was buttressed by Mr. Tarrant, who declared that Ms. Chatterton would be his C.E.O, and that she would be in charge of "everything," including paying rent. *Id*. at 51:4-18.[5]  Ms. Scaglione confirmed that Ms. Chatterton was the person she dealt with "ninety-nine percent of the time" during the tenure of MPF, and was in fact the person who wrote rent checks on behalf of MPF. *Id.* at 53:9-18, 114:9-22.

---

>    A. Yes.
>
>  Scaglione Dep. Tr.  50:5-14.  She later added:
>
>>    A. . . . As I said, when I had met Ms. Chatterton in the office, the door opened and Mr. Tarrant walked in and he introduced her as – he says, "I guess you've met Kathy." and I said, "Yes, I have." And he says, "Well, this is my CEO."
>>    Q. Pat Tarrant said that to you?
>>    A. Yes.
>>    Q. And do you recall what you said back to Mr. Tarrant, if anything?
>>    A. And I said, "Well, is she going to be the one that's going to be in charge of the office and taking care of anything that I need to have done like paying the rent and things like that? Is she the one I'm supposed to contact?" He says, "Absolutely. She is in full charge."
>>    Q. Okay. Do you recall anything else of your conversation with Ms. Chatterton in that first conversation?
>>    A. Only that she had made the statement that she was glad to be there and that she was going to certainly make a lot of changes and that it was going to be up to her to get things straightened out.
>
>  *Id.* at 51:4-25.

[4]   *See also* Scaglione Dep. Tr. 76:7-9, 76:17-20 ("Did Ms. Chatterton ever tell you, "I'm in charge because I'm a consultant"? A. That was never mentioned. . . . Q. But she didn't say to you, "This is all Mr. Tarrant's hiring me to do. I can't do this other thing you're asking"? A. Not at all.").

[5]   Ms. Scaglione later testified that this was indeed buttressed by Ms. Chatterton's own claim that "her responsibilities were varied and that they encompassed most everything." Scaglione Dep. Tr. 77:9-11.

6

According to Ms. Scaglione, Ms. Chatterton exercised considerable power over the activities of MPF. Ms. Scaglione testified, for example, that Ms. Chatterton was able to modify the proposed lease language during a lease negotiation, in spite of Mr. Tarrant's instructions to the contrary. *Id*. at 82:20-83:21.[6] Mr. Tarrant allegedly later approved Ms. Chatterton's decision, stating: "Well, whatever Kathy wants to do, that's fine with me. She runs it." *Id*. at 84:11-12. Similarly, Ms. Scaglione testified that Ms. Chatterton once prevented her from entering the Site, and had received the backing of Mr. Tarrant on the matter. *Id.* at 64:2-19. Mr. Tarrant is indeed claimed to have declared that Ms. Chatterton "was in charge, whatever she said went . . . ." *See id.* at 64:2-19.[7]

---

[6] In particular, Ms. Scaglione testified that:

> There were changes that were radically made with their lawyer about all the provisions that we had set down, and we had discussed it, she and I, and I said to her, "We're never going to finish with this." And she said, "Don't worry about it. Let's just do what we have to do to get this done." And I said, "Well, what are you going to do about Pat?" She said "Well, don't worry about Pat. I make the decisions. I will take care of it. Let's take it as it is and get on with it." And I said, "Well, what will Pat say about this?"
> "Don't worry about it. I will take care if it [sic]. Let's just do it and get it done. It's my decision."

Scaglione Dep. Tr. 83:8-21.

[7] Ms. Scaglione also reports the following conversation with Ms. Chatterton:

> A. And she said, "We are just unloading things from the business," and, "Don't worry about it. It's not a big thing. So I said, "I'd like to talk to Pat." Well, she said, "Pat has nothing to do with this. I make the decisions, and if you want to talk to him, fine, but please don't bother him. He's busy and he's working in New York and he's doing a lot of things. I'm in charge, and as long as I'm in charge, these are the rules that will be followed."

7

Ms. Scaglione further testified that Ms. Chatterton was deeply involved in all matters relating to hazardous waste product on the Site. She recalled in particular a conversation with Mr. Tarrant in which the need to ship sacks of hazardous materials off-site was addressed. Mr. Tarrant allegedly informed Ms. Scaglione at that time that she needed to "[t]alk to Kathy [Chatterton]. She's in charge. She's the one that sends the shipping out." *Id*. at 124:4-20. Ms. Scaglione followed up with Ms. Chatterton, who claimed that MPF did not have the money to ship the sacks off the property. Ms. Scaglione alleges, in fact, that Ms. Chatterton declared: "Well, you've got a choice, do you want me to pay you your rent check or do you want me to ship the sacks out." *Id*. at 126:22-127:11.

Similarly, when the issue of shipping the drums of waste off-site was broached with Ms. Chatterton, she allegedly "reiterated the whole sequence of events and told [Ms. Scaglione] that she was in charge of doing the manifest and she was doing her job and they would get done when they get done." *Id*. at 128:20-23. She also repeatedly reassured Ms. Scaglione that she would send them off-site in the near future. *Id*. at 129:3-18.

Finally, when informed by Ms. Scaglione that the Bergen County authorities were claiming that MPF were not in compliance with County environmental statutes and regulations, Ms. Chatterton allegedly stated that she would "take care of it." *Id*. at 100:4-21.

   c. Trial Testimony of Ms. Chatterton

Ms. Chatterton, on the other hand, claims that she was merely a consultant to MPF and had very little executive authority over the MPF business. Indeed, Ms. Chatterton testified at trial that she did not have the authority to cash checks for amounts greater than $500. 4/3/07

---

Scaglione Dep. Tr. 66:17-25.

A.M. Tr. 47:13-19.  While she acknowledged cashing several checks to MPF in amounts in excess of $10,000 in the summer of 1997, she claims to have only done so with Mr. Tarrant's approval.  *Id*. at 47:20-22.

Ms. Chatterton further testified that she was aware of the hazardous waste situation at the Site, but did not have the authority to have the hazardous material shipped off the premises.  Indeed, Ms. Chatterton acknowledged that she had signed documents relating to the handling of hazardous waste at the MPF facility,  4/3/07 Tr. 29:18-31:15, testifying in particular that she had signed a document concerning the discharge of wastewater from the MPF facility, a document that was later submitted to the local industrial wastewater discharge authority.  4/3/07 Tr. 34:16-35:4. She denied, however, independently drafting a check for a waste water application fee to the Bergen County Utility Authority, claiming instead to have produced it under dictation.  *Id*. at 31:2-24.  This testimony appeared inconsistent with the testimony she had offered at her deposition.  *Id*. at 32:23-33:25.

Finally, Ms. Chatterton acknowledged having discussions with Mr. Boyko and Mr. Puff regarding the shipping of hazardous waste off the Site, and meeting with them regularly to discuss the topic. *Id*. at 50:18-52:4.

     d. Trial Testimony of Paul Boyko

Mr. Boyko was an employee of MPF involved in the disposal of waste at the Site.  He claims to have been informed by Mr. Tarrant at MPF's inception that Ms. Chatterton would be Mr. Tarrant's "right arm."  *Id*. at 76:19-25.  Mr. Boyko testified that after four or five months of operations, Mr. Tarrant began appearing less frequently at the Site. *Id*. at 77:1-78:19, 87:17-22.  From that point onward, Mr. Boyko reported directly to Ms. Chatterton.  *Id.*

9

Mr. Boyko testified that Ms. Chatterton had significant involvement in the management of the Site's hazardous waste material. Mr. Boyko kept a log of his daily activities at the Site. Mr. Boyko's log notes indicate, on at least one occasion: "[m]et with Kathy Chatterton regarding hazardous waste. She has not made a decision to ship yet. I was instructed to get balance of past due from Potomac Environmental." *Id*. at 105:19-22. Mr. Boyko also testified that Ms. Chatterton asked him to draw up a budget for the removal of hazardous waste from the property. *Id*. at 80:3-15. Mr. Boyko acknowledged, however, that he did not know whether Ms. Chatterton had the ability to authorize payment for the shipping of hazardous waste material off-site, and did not know whether the large checks he knew she had signed had been previously submitted for Pat Tarrant's approval. 4/3/07 P.M. Tr. 16:15-17:7.

   e. Trial Testimony of Pat Tarrant

Mr. Tarrant was the sole owner of MPF. Mr. Tarrant maintained at trial that Ms. Chatterton only had the ability to make minor administrative decisions without his authorization. *Id*. at 55:18-22. He also claimed that she could only cash checks over a few hundred dollars with his approval. *Id*. at 62:19-63:2.

With respect to the management of hazardous waste materials, Mr. Tarrant testified that Ms. Chatterton did not have the authority to authorize waste shipments, and in fact did not have any involvement with the disposal of hazardous waste. *Id*. at 37:16-18, 40:18-20.

   f. Trial Testimony of Steven Puff

Mr. Puff testified that he was the Regional Manager for Potomac Environmental Inc. ("Potomac"), the organization hired by MPF to occasionally ship hazardous waste material from the Site. 4/5/07 Tr. 4:15-17.

Mr. Puff claims to have met with Ms. Chatterton and Mr. Tarrant in early 1997 to discuss the issue of waste disposal from the Site. *Id*. at 10:5-17. He testified that: "Mr. Tarrant . . . made it clear to me that . . . he was the person in charge[, but that] Ms. Chatterton would be the daily operations person." *Id*. at 10:20-24.

Mr. Puff further testified that he visited the Site on a biweekly basis to seek payment for the waste disposal services and to oversee the disposal of waste product. *Id*. at 7:12-22, 11:3-16. He would meet with Ms. Chatterton as "she was the person who was identified as making the decisions on behalf of Mr. Tarrant and for the facility . . . ." *Id*. at 11:17-18, 14:10-14. Mr. Boyko claims that Ms. Chatterton had the authority to negotiate the price of Potomac's services on behalf of MPF. *Id*. 14:24-15.

Finally, Mr. Puff acknowledged sending a number of letters to Ms. Tarrant addressing her as President of MPF. *Id.* at 14:1-3, 15:16-18; 16:21-23. He added that Ms. Chatterton never indicated that she lacked the authority to make decisions relating to waste management, or that Mr. Puff should be discussing waste management issues with Mr. Tarrant rather than her. *Id.* at 24:25-25:8.

   3.  Analysis

In a non-jury trial, the Court is the sole judge of the credibility of each witness and the weight to be given to his or her testimony. The determination of the credibility of a witness depends largely on the impression made by the witness as to whether he or she was giving an accurate and truthful version of what occurred. In weighing the testimony of a witness, the Court will consider his or her interest, if any, in the outcome of the case, his or her manner in testifying and the extent to which he or she has been supported or contradicted by other credible evidence.

Here, the Court has been presented with substantial credible evidence from Mr. Kahn, Mr. Puff, Ms. Scaglione and Ms. Chatterton herself that she was informed and kept abreast of the need to remove hazardous waste from the property. There is also substantial credible evidence that Ms. Chatterton described herself – and was described by Mr. Tarrant – as the person in charge of running MPF. This is further buttressed by the documents bearing her signature as an officer of MPF.

That evidence alone, however, is not sufficient to establish that Ms. Chatterton had the "high degree of personal involvement in the operation," *Gloucester*, 800 F. Supp. at 1215 (emphasis added), and "participat[ion] in the hazardous substance disposal activities,"*Analytical Measurements*, 816 F. Supp. at 298, necessary for her to qualify as an "operator" under Section 107 of CERCLA. The question this Court must ultimately answer is the following: has Plaintiff established that Ms. Chatterton had the power to take charge of the hazardous waste removal process herself and assign funds on behalf of MPF to pay for said removal?

This Court finds that Plaintiff has established by a preponderance of the credible evidence that Ms. Chatterton had such power. Indeed, the evidence offered by Ms. Scaglione establishes that Mr. Tarrant specifically stated that Ms. Chatterton was in charge of shipping the hazardous material off-site, and that he was to have little involvement with the process. This is further buttressed by her testimony that Ms. Chatterton claimed to be in a position to decide whether to allocate MPS' funds to shipping the sacks and drums of hazardous waste off the site or paying the rent. Ms. Scaglione's testimony is also consistent with the testimony of Mr. Boyko, which establishes that the decision to ship the hazardous waste off-site was Ms. Chatterton's to make, and the testimony of Mr. Puff, which confirms that Ms. Chatterton had the power to negotiate the

price of Potomac's services on behalf of MPC and thus had considerable control over the removal of hazardous waste.

While Ms. Chatterton and Mr. Tarrant both deny vehemently that Ms. Chatterton had the power to personally order the waste material off the Site, the Court, having heard and observed the testimony of all the witnesses (except Ms. Scaglione, who testified by deposition taken in Phoenix, Arizona) finds the testimony of Mr. Tarrant and Ms. Chatterton not credible and that of the other witnesses credible. The testimony of the witnesses other than defendants thus leads this Court to conclude that Plaintiff has established by a preponderance of the evidence that Ms. Chatterton "manage[d], direct[ed], or conduct[ed] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Best Foods,* 524 U.S. at 66-67.

**CONCLUSION**

For the foregoing reasons, the Court finds that Ms. Chatterton is liable under Section 107(a)(2) of CERCLA as an "operator" of the facility at the time of the waste disposal.

Dated: April 24, 2007

s/ Garrett E. Brown, Jr.  
GARRETT E. BROWN, JR., U.S.D.J.